UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:12-CR-42-FTM-99DNF

───

THE UNITED STATES OF AMERICA,

          Plaintiff,

                                   Fort Myers, Florida
vs.                                  March 13, 2013

ADRIAN PEREZ,                     9:31 a.m.

          Defendant.

───

TRANSCRIPT OF SENTENCING

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR PLAINTIFF:    Office of the United States Attorney
                  2110 First Street
                  Suite 3-137
                  Fort Myers, FL  33901
                  (239) 461-2200
                  BY:  JESUS M. CASAS, ESQ.
                        Assistant United States Attorney

FOR DEFENDANT:    Joffe & Joffe, P.A.
                  One East Broward Boulevard
                    Suite 700
                  Fort Lauderdale, FL  33301
                  (954) 723-0007
                  BY:  DAVID JONATHON JOFFE, ESQ.

ALSO PRESENT      GABRIELLA PEDROZA-HARDING,
                    Certified Interpreter
                  JODI PETERSEN, Probation Officer

REPORTED BY:      JEFFREY G. THOMAS, RPR-CP
                  Official Federal Court Reporter
                  United States Courthouse
                  2110 First Street, Suite 2-194
                  Fort Myers, FL  33901
                  (239) 461-2033

I N D E X

| March 13, 2013 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 1 | 4 |
| Defense Factual Objections to PSR | 1 | 6 |
| Response by Mr. Casas | 1 | 8 |
| Further Argument by Mr. Joffe | 1 | 10 |
| Order of Court | 1 | 11 |
| Argument Re Acceptance of Responsibility by Mr. Joffe | 1 | 11 |
| Response by Mr. Casas | 1 | 14 |
| Order of Court | 1 | 15 |
| Motion for Downward Departure by Mr. Joffe | 1 | 15 |
| Response by Mr. Casas | 1 | 17 |
| Further Argument by Mr. Joffe | 1 | 19 |
| Order of Court | 1 | 20 |
| PSR Adopted by the Court | 1 | 21 |
| Motion for Forfeiture by Mr. Casas | 1 | 22 |
| Response by Mr. Joffe | 1 | 25 |
| Further Argument by Mr. Casas | 1 | 25 |
| Order of Court | 1 | 26 |
| Argument Re Sentence and Variance by Mr. Joffe | 1 | 27 |
| Argument Re Sentence and Variance by Mr. Casas | 1 | 30 |
| Further Argument by Mr. Joffe | 1 | 35 |
| Imposition of Sentence | 1 | 38 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

|                                        | Vol. | Page |
|----------------------------------------|------|------|
| Defendant Advised of Right to Appeal   | 1    | 42   |
| Certificate of Court Reporter          | 1    | 44   |

* * *

1      THEREUPON, the above-entitled case having been called

2   to order, the following proceedings were held herein,

3   to-wit:

4                              - - -

5           THE COURT:  Let's have the interpreter placed under

6   oath, please.

7           THE COURTROOM DEPUTY:  Do you solemnly swear or

8   affirm that you will truthfully and to the best of your ability

9   translate all oaths administered during these proceedings, all

10  questions propounded by the Court, all other questions under

11  its authority, all responses thereto, as well as all other

12  dialogue in the case now before the Court?

13          MS. PEDROZA-HARDING:  I do.

14          THE COURTROOM DEPUTY:  You state your full name,

15  please.

16          MS. PEDROZA-HARDING:  My name is Gabriella

17  Pedroza-Harding.  P E D R O Z A hyphen H A R D I N G.

18          THE COURT:  Thank you.  And if you would translate

19  simultaneously for us, please?

20          MS. PEDROZA-HARDING:  Yes.

21          THE COURT:  This is the case of the United States

22  versus Adrian Perez.  It is Case 2:12 Criminal 42.

23  Representing the United States is Assistant United States

24  Attorney Jesus Casas.  Representing the defendant, who is

25  present in court, is Attorney David Joffe.  We are scheduled

```
 1    for a sentencing.
 2                Are both sides ready?
 3                MR. CASAS:  Yes, Your Honor.
 4                MR. JOFFE:  Yes, Your Honor.
 5                THE COURT:  Mr. Joffe, if you and your client and the
 6    interpreter would approach the podium for me, please?
 7                Do you need to stay there because of the equipment?
 8                MS. PEDROZA-HARDING:  Yes, sir.
 9                THE COURT:  I okay.  I think it moves, but whatever
10    you're comfortable with.  I think we can get the wires so they
11    move.
12                All right.  Thank you.
13                Mr. Perez, on December the 7th of 2012, a jury found
14    you guilty of Count 1 of an indictment charging you with
15    conspiracy to commit mail fraud and healthcare fraud, in
16    violation of Title 18, United States Code, Sections 1341, 1347,
17    and 1349; and Counts 2, 3, 4, 5, 6, and 6, charging you with
18    aiding and abetting healthcare fraud, in violation of Title 18,
19    United States Code, Sections 1347 and 2; and Count 10, charging
20    you with aiding and abetting mail fraud, in violation of
21    Title 18, United States Code, Section 1341 and Section 2.
22                The Court has previously adjudicated you guilty of
23    those offenses.  We have now reached the stage of the
24    proceedings where it's my obligation to decide what sentence
25    should actually be imposed upon you.  Has the pre-sentence
```

1    report, as well as the addendum to that report, been read and

2    translated to you?

3              THE DEFENDANT (Via Interpreter):  Yes.

4              THE COURT:  And have you discussed the contents of

5    those documents with your attorney?

6              THE DEFENDANT (In English):  Yes.

7              MS. PEDROZA-HARDING:  Yes.

8              THE COURT:  Mr. Joffe, have you likewise read the

9    pre-sentence report and the addendum, and discussed the

10   contents of each with your client?

11             MR. JOFFE:  Yes, Your Honor.

12             THE COURT:  And, Mr. Casas, have you also had the

13   opportunity to review the pre-sentence report, as well as the

14   addendum?

15             MR. CASAS:  I have, Your Honor.  I have no objection

16   to the factual basis, nor the application of the guidelines

17   contained therein.

18             THE COURT:  All right.

19             Mr. Joffe, any unresolved factual objections to the

20   contents of the pre-sentence report?

21             MR. JOFFE:  Yes, Your Honor.

22             THE COURT:  All right.  Let's hear what those are.

23             MR. JOFFE:  Certainly.

24             My First objection, it's factual and legal, goes to

25   Paragraph 75, Page 17 of the PSR, my client's role in the

1    offense.  Our position is, under 3B1.1 or 3B1.2, that he is a

2    minor participant based upon his conduct in this case.

3            Probation provided an addendum dated March 4, 2013.

4    Their position is that Mr. Perez was a receptionist, which he

5    was; that he was also responsible for the accounts receivable.

6            I somewhat disagree that he was responsible for the

7    accounts receivable.  There were other individuals that worked

8    in the clinic.  I believe Mr. Perez's function was basically to

9    be an intake person.

10           Probation takes the position that Mr. Perez coached

11   patients what to say to the doctor.  I believe there was one

12   patient, an undercover officer, who had a discussion with my

13   client, and my client told him what to tell the doctor based

14   upon his pain level.

15           Probation also goes on to state that he, meaning

16   Mr. Perez, provided the patients with blank forms with

17   different-colored pens.  I believe the only individual who

18   testified to that was the individual being paid by the

19   insurance company, as a paid investigator, who claims that he

20   was provided with a series of different-colored pens.  And I

21   believe, through cross-examination, other witnesses stated that

22   there was either one-color pen that was used, but there was not

23   a series of colored pens that were used.

24           Probation also states that he, meaning Mr. Perez, had

25   knowledge of the scope of the criminal scheme.  I think, as far

1    as knowledge of the scope of the scheme, it may have become

2    more known to my client as time went on, certainly once he was

3    arrested.

4           So I would state that my client was less culpable

5    than the average participant, and he should receive a two-level

6    reduction for minor role.

7           Should I talk to the acceptance of responsibility as

8    well?

9           THE COURT:  Unless it ties into the role, probably

10   not.

11          Let me take them individually so I hear from the

12   government as to that issue.

13          MR. CASAS:  Your Honor, as Mr. Joffe indicated,

14   Mr. Ralph Garcia testified, at trial, that he was told what to

15   tell the doctor in terms of his pain level, and what he was

16   taking, I believe it was Advil or some type of pain reliever,

17   for his pain.  He also testified that he was provided blank

18   forms, and multiple pens, to sign those forms, by the

19   defendant.  So there was testimony at trial to support those

20   factual allegations as they're set out in the pre-sentence

21   report.

22          As far as Mr. Perez's role in the offense, certainly

23   he was not an organizer/leader.  I would not even characterize

24   him as a manager.  He was an active and average participant in

25   the day-to-day activity of the clinic and the scheme.

1            The massage therapists created the phoney treatment

2    forms, and Mr. Perez took those treatment forms, knowing that

3    they were phoney, as it was laid out in the testimony at trial,

4    and he then prepared the billings which were submitted to the

5    insurance companies.  And so he played as integral a part in it

6    as the massage therapists, and therefore we don't see him as

7    substantially less culpable than other participants in this

8    particular scheme.  He's been attributed a leadership role, but

9    he certainly was an average individual within the scheme.

10           He's being held accountable only for the financial

11   repercussions of the criminal activity that took place with

12   regard to the undercovers during the time frame that he worked

13   there, not for the overall financial activity that was

14   associated with the clinic during the time frame that he worked

15   there.

16           So in terms of fairness to Mr. Perez, he certainly is

17   being held accountable for just that criminal conduct that was

18   directly attributable to his participation while law

19   enforcement investigated that location; and we believe, under

20   those circumstances is, he's not substantially less culpable

21   than the average participant.

22           THE COURT:  From what you've said, it would seem that

23   the calculation by the probation office would essentially

24   understate his culpability, if all they used was the undercover

25   figures instead of the other figures that were attributable to

1    the clinic while he was there.

2            MR. CASAS:  Certainly.  Certainly, it understates it

3    from the viewpoint of these were not the only fraudulent

4    patients at the clinic.  And the testimony bore that out

5    through the testimony of Miss Santana and Mr. Duarté.  And

6    again, what is most readily proveable in this case is the

7    fraudulent conduct as it relates to the undercovers.

8            Is there fraudulent conduct beyond that?  Absolutely.

9    Is he being held accountable for it in this pre-sentence

10   report?  No.  Do we still believe that it was proven at trial,

11   through other testimony?  Yes.  Nevertheless, for that reason,

12   we don't believe he merits any departure -- downward departure

13   for his role in this offense.

14           THE COURT:  All right.

15           Mr. Joffe, anything further as to the role issue?

16           MR. JOFFE:  Your Honor, not other than to say that,

17   concerning issues proven at trial, I don't believe that

18   additional fraudulent conduct as it relates to my client

19   specifically was, in fact, proven at trial; and certainly I

20   would disagree with that.

21           I would also state that my client was, in fact,

22   recruited by his uncle, who has since fled the country, and was

23   not here for trial.  The massage therapists were responsible

24   for completing the false treatment forms, and my client

25   essentially acted as a receptionist in the clinic.  And I think

1    he should qualify as a minor participant.

2           THE COURT:  All right.  Well, the Court certainly has

3    the authority, under Section 3B1.1 of the sentencing

4    guidelines, to depart downward.  Or I think, more technically,

5    consider it a downward adjustment based upon the defendant's

6    role, if indeed he was a minor participant.

7           Based upon the testimony I heard at trial, and the

8    information set forth in the pre-sentence report, the Court

9    would find that the defendant was not a minor participant, but

10   was an active and average participant.

11          I certainly agree with the government to the extent

12   they say that the defendant was not a supervisor, manager,

13   leader, organizer, or any of those kinds of leadership

14   characterizations; but I think he was at least substantially

15   average in terms of his participation in furthering the

16   conspiracy for which he was convicted.  Therefore, the

17   objection to the Paragraph 75 will be overruled.

18          Mr. Joffe, I think your next issue is the acceptance

19   of responsibility?

20          MR. JOFFE:  That's correct, Your Honor.  Paragraph 79

21   at Page 17 of the PSR.

22          If we look at Page 2 of the March 4, 2013, submission

23   by probation, the addendum, it talks about sentencing guideline

24   Section 3D1.1, Comment Note 2.  And the last sentence of that

25   says, "In each such instance, however, a determination that a

1    defendant has accepted responsibility will be based primarily

2    upon pretrial statements and conduct."  United States

3    Sentencing Guideline 3.E1.1, Comment Note 2.

4           And really my argument is, if we look at the pretrial

5    statements that were made by my client -- and it was played for

6    the jury during the course of this trial -- he admitted his

7    culpability in this case during the interview by law

8    enforcement.

9           THE COURT:  And that's why he went to trial?  I mean,

10   it sure seems to me like, pretrial, he indeed admitted his

11   culpability.  It would have been a routine guilty plea had that

12   been his decision.  He decided not to.  He basically took a

13   shot with the jury, and he lost.  I don't see how that

14   qualifies as acceptance of responsibility under the guidelines.

15   He tried to have the best of both ways.

16          MR. JOFFE:  I understand.  My sense is that the

17   reason why he went to trial is there was enormous pressure

18   placed upon him by his father.  I spent a lot of time with my

19   client, and with his wife, and with the father; and I think

20   there was a lot of pressure from the father, who was the

21   brother of the co-defendant who absconded, for my client to go

22   to trial; and my client, being the son and the nephew, said

23   okay, I'll go to trial.

24          We did attempt to resolve this case by plea.

25   Mr. Casas was very generous in the plea.  My client probably

1  would have scored probation had he taken the plea.  And he

2  chose not to.  I think there was a lot of pressure from his

3  family to go forward to trial.  I think that's really the

4  reason he went to trial.

5         THE COURT:  That's not an unreasonable assessment.

6  From what I see.

7         MR. JOFFE:  Right.

8         THE COURT:  So I understand that.

9         MR. JOFFE:  I understand.  But I do make the argument

10 for acceptance of responsibility.  There was a videotaped

11 statement, and I think, under 3E1.1, Note 2, that this last

12 portion really applies to his pretrial conduct, which is that

13 he made the statement to law enforcement that he was, in fact,

14 involved.

15        THE COURT:  So you think anyone who makes a pretrial

16 statement/confession, and then goes to trial, deserves

17 acceptance?

18        MR. JOFFE:  Not anyone, but I think Mr. Perez does.

19 I think each case is different; and I think, in this particular

20 case, the unique factor is the fact that he was basically

21 instructed, I think by his father, and maybe his uncle, to go

22 forward in this case.

23        THE COURT:  He's full grown.  He gets to make his own

24 decisions.  I know family pressure can be a troublesome thing

25 sometimes, but . . . .

1          MR. JOFFE:  Right.  And you're correct, Your Honor,

2     in that he is an adult, he's full grown; but he's really a kid

3     at heart, so he finds himself in this situation.

4          THE COURT:  I would like to think all of us are kids

5     at heart, to one level or another; but I understand what you're

6     saying.

7          MR. JOFFE:  Thank you.

8          THE COURT:  Let me hear from the government.

9          MR. CASAS:  Your Honor, our position is the defendant

10    should not receive a reduction for acceptance of

11    responsibility.  Again, the facts are what they are.  The

12    defendant, in a roundabout way, admitted to his culpability in

13    his pretrial statement.  I was not privy to any communications

14    between the defendant and his father.

15         Certainly, at trial, we saw that the defendant's

16    father and mother had some involvement with the clinic at its

17    inception, by way of being patients, or perhaps being paid for

18    being patients.  Nevertheless, I don't think anything in this

19    case warrants his acceptance of responsibility being granted.

20    There's been nothing further after that pretrial statement.  He

21    went to trial, as the Court said, he took a shot, and it came

22    up short.

23         THE COURT:  All right.

24         Mr. Joffe, do you have anything further as to that

25    issue?

1          MR. JOFFE:  No, Your Honor.

2          THE COURT:  Well, again, the Court has the authority,

3    under the guidelines, to grant acceptance of responsibility in

4    an appropriate situation.  In this case, I guess I've

5    telegraphed what I thought in terms of his ability to claim

6    acceptance of responsibility under the facts of the case, and

7    given his going to trial, and not prevailing.  I don't think

8    what he's done constitutes acceptance of responsibility within

9    the meaning of the guidelines, so that objection will be

10   overruled.

11         Mr. Joffe, any other sentencing guideline issues?

12         MR. JOFFE:  No, Your Honor.  Other than arguments for

13   a downward departure or downward variance.

14         THE COURT:  Well, the downward departure is a

15   guideline issue.  The variance isn't.

16         MR. JOFFE:  Well, I do have an argument under 5H1.6,

17   Note 1B1, in Page 9 of my request for a downward variance or

18   downward departure based upon family ties and responsibility.

19         My client's young wife just had a baby about 18 days

20   ago.  My client is gainfully employed at Steak & Shake.

21   Granted, it doesn't pay a whole lot, but he is working full

22   time; so there will be the loss of caretaking or financial

23   support of his young wife and his young child.  So I'm asking

24   for a downward departure under 5H1.6.

25         THE COURT:  Let's talk about the other departure

 1    issues, as well.  As I read it, you've got additional guideline

 2    issues, under Section 5H or 5K, various subsections of that,

 3    which are a little different, legally, than the variance

 4    requests.  So if I could, let me hear all of your arguments

 5    with regard to the departure, and then I'll hear from the

 6    government, then I will move on to the variance.

 7              MR. JOFFE:  Certainly.  I mean, my client has no

 8    criminal history whatsoever.  The history and characteristics

 9    of my client is he's led a law-abiding life.  He obtained an

10    education.  He's attempted to work at lawful and legal jobs.

11    He was, in fact, recruited by his own family member, i.e. his

12    uncle, in this case.  But for the fact that his uncle opened up

13    this clinic, more likely than not Mr. Perez would not have

14    worked at this clinic.

15              I don't think there is anything historically to show

16    that he has a history of breaking the law or engaging in

17    criminal conduct.  I think this was somewhat of a youthful

18    indiscretion.  I think this was somewhat aberrant for him.  I

19    don't think this is something he'll ever do again, and I think

20    he certainly learned his lesson.

21              His uncle has absconded, possibly somewhere outside

22    the country, I don't know, and has essentially left him and

23    others essentially holding the bag in this particular case.

24              THE COURT:  All right.

25              Mr. Casas?  With regard to the departure issues?

1    MR. CASAS:  Your Honor, in assessing the departure

2    under 5H1.6, and just taking into the consideration the

3    commentary, it's not exhaustive in the circumstances

4    considered; but, certainly, it asks the Court to consider the

5    seriousness of the offense, the involvement in the offense, if

6    any, of members of the defendant's family, and the danger, if

7    any, to members of the defendant's family as a result of the

8    offense.

9    I don't think this was a dangerous offense by virtue

10   of the nature of it.  Certainly, there was evidence at trial

11   that the defendant's wife, the mother of his child, was

12   involved in this offense.  The defendant's parents were

13   involved in this offense.

14   In terms of the seriousness of it --

15   THE COURT:  I'm sorry.  Let me stop you.  When you

16   say involved, do you mean criminally involved, or involved as

17   patients --

18   MR. CASAS:  Involved as patients.  And, if the Court

19   recalls, the testimony was the defendant's mother and father

20   were the first two patients in the ledger that was introduced

21   in evidence, substantiated that there were payments associated

22   with those two individuals.

23   There was also an indication that Daylene Brea, who

24   was the defendant's wife, or mother of his child, was also a

25   patient.  And that was reflected in the evidence, as well.  And

1    that's what I mean in terms of their involvement in the

2    offense.

3              THE COURT:  Okay.  Thank you.

4              MR. CASAS:  In terms of the seriousness of the

5    offense, there was a recent appellate decision from the

6    11th Circuit that outlines the challenges posed by healthcare

7    fraud and law enforcement's investigation and ability to

8    infiltrate that, and the costs that are associated with that to

9    society.  And so I do think that this is a serious offense.

10             It's a very costly offense to society in general.

11   And while it doesn't involve violence, it certainly involves a

12   financial impact on everyone, primarily those who have

13   automobile insurance, in terms of the cost associated with

14   that, that is born by individuals who have automobile

15   insurance, as a result of the fraud that's committed.  So,

16   certainly, those are circumstances to consider.

17             In terms of the loss to the defendant's family as a

18   result of any potential incarceration in this case, certainly,

19   his familial circumstance is not unique.  There are many

20   defendants that come before this Court that have small

21   children, young children, or even substantial family members

22   who, again, will suffer as a result of an individual's

23   incarceration, whether it be a mother, father, or otherwise;

24   and, in this particular case, I don't believe that there's any

25   reason to believe that the loss of caretaking or financial

1    support will substantially exceed the harm ordinarily incident

2    to incarceration for a similarly situated defendant.

3              Again, that's just based on the limited information

4    that we have before the Court.  The defendant does have a job,

5    but we don't know what the rest of the financial circumstances

6    with the family are.  We don't know if his wife is working.  We

7    don't know if his parents are supporting him.

8              My recollection was the defendant was residing with

9    his parents at one point in time.  I assume that continues to

10   be the case.  And I think that's born out in the pre-sentence

11   report, as well.

12             So again, in terms of this case, I just don't believe

13   that there's anything that would show that this is unique, or

14   substantially excessive, of what the average defendant and

15   defendant's family members are sometimes subject to as a result

16   of the crimes they commit.

17             THE COURT:  All right.  Thank you.

18             Mr. Joffe, anything further as to the departure

19   issues?

20             MR. JOFFE:  Yes, Your Honor.  I would alert the Court

21   to Page 20 of the PSR, Paragraphs 110 through 113, financial

22   condition/ability to pay.

23             This talks about a fine, but it says that my client's

24   only asset is a 1994 Acura, valued at $1,500, that he sold in

25   November of 2012; that Mr. Perez relies on his father and

1   girlfriend for transportation to and from work.  He gives his

2   parents $600 a month to assist with living expenses.  He has a

3   $16,822 deferred student loan balance.  I was appointed to

4   represent him because he was found indigent.  The IRS records

5   were not available.  Probation has found that he does not have

6   the ability to pay a fine within the guideline range.

7           Paragraph 106, at Page 19 of the PSR, states that my

8   client has been employed at Steak & Shake in Cape Coral,

9   Florida, since October 26th of 2012, earning approximately

10  $1,386.66 monthly income working 40 hours a week.

11          So I think, clearly, the money that he's able to

12  contribute to the family certainly is a factor, even though he

13  is living with his parents, that the Court can take into

14  consideration.  And he is supporting, or attempting to support,

15  himself and his young wife and newborn child.  So I think, from

16  a strict financial standpoint, he would qualify.

17          But I think, under 5H1 through 5H1.16, the Court

18  should also look at my client's age, his education, his

19  employment record, family ties and responsibilities, and his

20  mental and physical condition, which are quite positive.

21          THE COURT:  All right.  Well, the Court certainly has

22  the authority, I believe, under Section 5H1.6, 5H1.1, 5H1.16,

23  and I forget the section, but it relates to the heartland

24  argument.  The Supreme Court case is Koon.  Under all those

25  bases, the Court has the ability to depart under the

1    appropriate circumstances.

2            Discussing the heartland case first, and Koon in

3    particular, there's nothing in this case that takes it out of

4    the heartland.  So I don't find any basis for a downward

5    departure on that ground.

6            Taking a look at the defendant's family situation,

7    his age . . . he's 22.  I said he's full grown.  For a lot of

8    us, 22 is still pretty young.  His education, his family, his

9    employment, both sides have talked about those things.  I see

10   family members present in the courtroom.  I gather that he's

11   single, but is a father of a very young child.

12           Those circumstances, frankly, do not distinguish him

13   from many people who are before the Court for sentencing; and I

14   don't find that any of those factors are present in such an

15   extraordinary degree in this case that would justify the

16   departure under the sentencing guidelines.

17           So the Court is going to deny the request for the

18   downward departure as set forth in your written motion and as

19   argued here this morning.

20           Is that the end of the guideline issues?

21           MR. JOFFE:  Yes, Your Honor.

22           THE COURT:  All right.  The Court would adopt the

23   factual statements set forth in the pre-sentence report, as

24   well as the application of the guidelines.  The result of that

25   is as follows:

1          The total offense level is 11.  The defendant's

2   criminal history is a Category I.  The resulting range of

3   imprisonment is 8 to 14 months.  Supervised release is one to

4   three years.  Restitution is $14,866.37.  The fine range is

5   $2,000 to $20,000.  And there's a mandatory special assessment

6   which totals $800 in this case.

7          Mr. Casas, are there any victims present in the court

8   who wish to address the Court?

9          MR. CASAS:  No, Your Honor.

10          THE COURT:  All right.  The government has filed a

11   motion for a forfeiture money judgment which mirrors the amount

12   of restitution.

13          Mr. Casas, do you care to be heard as to that?

14          MR. CASAS:  The only thing I'd care to say about

15   that, Your Honor -- and the Court knows that forfeiture is a

16   punishment apart from restitution in this case.  Certainly, we

17   think that the defendant should be required to pay restitution

18   to the victims.  The forfeiture, if ordered by the Court,

19   certainly would be used to satisfy that restitution.

20   Nevertheless, we stand by the motion and its contents, and

21   leave it to the Court's discretion in determining whether it's

22   appropriate in addition to the restitution.

23          THE COURT:  Are you saying that, if I grant the money

24   order judgment, the government will not try to collect on that

25   apart from the restitution?  That is, it won't be a monetary

1    consequence of 28,000, 29,000, whatever, if you add the two

2    together?

3         MR. CASAS:  My understanding is, if anything is

4    collected in the forfeiture money judgment, it's used to

5    satisfy restitution.  That's what I've been told.  I don't have

6    the day-to-day involvement with that aspect of it, but that's

7    my understanding.

8         THE COURT:  And is it your understanding that that's

9    the way it is because the U.S. Attorney's Office does it that

10   way, or because they have to do it that way?

11        MR. CASAS:  Good question, Your Honor.  I don't have

12   a basis of comparison to other offices.  I cannot answer that.

13        THE COURT:  I'm just trying to think back in cases

14   that I have had with your office -- and I don't mean handled in

15   the Fort Myers Division, but in the back of my mind it seems to

16   me I've had dealings with an Assistant U.S. Attorney in Tampa,

17   in the forfeiture unit, that took the position that restitution

18   was one thing, and forfeiture was another, and you just add

19   them together, and the government --

20        MR. CASAS:  They are certainly two different things.

21   One has a punitive consequence, and the other has a remedial

22   consequence for the victims.  But again, my understanding is

23   the victims are the first of concern; and if there's a way to

24   make them whole, then, certainly, that's what's addressed

25   first.

1            THE COURT:  I guess my question is, assume for the

2    moment that the government could compel the defendant to make

3    restitution, and could compel the defendant, in addition, to

4    satisfy any money judgment that was entered; are you saying

5    that, in this case, you won't do that?

6            MR. CASAS:  No.  What we would take is the money and

7    apply it to the restitution amount.

8            THE COURT:  And so if he wrote you a check for the

9    amount of the forfeiture money judgment, that would be turned

10   over to the victims, and it would satisfy both the money

11   judgment and the restitution?

12           MR. CASAS:  Prospectively, that's what I would

13   understand.

14           THE COURT:  When you say prospectively, I don't

15   understand what you mean.

16           MR. CASAS:  That's what happened.

17           THE COURT:  So you're not going to double collect.

18           MR. CASAS:  I think, if the restitution is satisfied

19   by way of the payment of the forfeiture money judgment, then

20   we're done.

21           THE COURT:  All right.

22           MR. CASAS:  I think it's intended to -- you know --

23   punish the defendant; but, at the same time, the realization is

24   restitution is the primary consideration.

25           THE COURT:  All right.  Let me hear from Mr. Joffe.

1           MR. JOFFE:  Your Honor, my only concern is that,

2      essentially, it would allow the government to collect twice,

3      restitution and the forfeiture.  If the government is

4      representing that they're just seeking forfeiture in order to

5      obtain restitution, and the amount is the same, I have no

6      objection; but if it would be a situation where my client is

7      responsible twice, I would raise an objection to the

8      forfeiture.  My client doesn't have anything to begin with,

9      so . . . .

10          THE COURT:  Mr. Casas?

11          MR. CASAS:  I think the money judgment just allows

12     the office to pursue it for a longer period of time than the

13     restitution.  That's the reality.  The judgment is valid, I

14     believe, for a longer period than the potential supervised

15     release which the Court can impose in this case.  So if

16     Mr. Perez does not make good during the timeframe of supervised

17     release, then the office could pursue it for a longer period of

18     time.  So he doesn't get away, so to speak, with the financial

19     benefits of the crime.  So the judgment just extends the

20     timeframe that it's collectible.

21          THE COURT:  Is there any objection from the

22     government . . . and in a way, I'm sorry to put you on the

23     spot --

24          MR. CASAS:  No, sir.  That's okay.

25          THE COURT:  -- but I think that's necessary.  Is

1    there any objection from the government to the forfeiture money

2    judgment including not only the form that you submitted, but

3    verbiage to the -- that will indicate the government

4    essentially cannot collect twice; that is, the amount of

5    restitution and the amount of the money judgment?

6         MR. CASAS:  If the Court would give me an opportunity

7    to consult before I agree to it, so I don't create a precedent

8    that somebody else gets upset about, I would appreciate it.

9         THE COURT:  I guess my concern is, I'm not sure that

10   your office would agree to that as a general principle.  I

11   don't have any reason to believe that, as to Mr. Perez, anyone

12   is going to take issue with what you've said; but my guess is

13   that they want the ability, in other cases, to go after both

14   restitution and the money judgment, depending on the character

15   of the defendant.

16        MR. CASAS:  And I think the Court's probably correct.

17   Each case kind of stands on its own.  Certainly, this case may

18   not be the same as, perhaps, other defendants in this case that

19   the Court may see down the road, where we will want the ability

20   to collect both.

21        THE COURT:  Let me do it this way.  Let me take your

22   motion for the forfeiture money judgment under advisement.

23        MR. CASAS:  Yes, sir.

24        THE COURT:  I've heard what Mr. Joffe has said in

25   terms of what his objections are.  Let me have you submit

1    something as to whether you object to that language.

2                    MR. CASAS:  Yes, sir.

3                    THE COURT:  If there's no objection from the

4    government, there's no objection from the defendant, then it

5    essentially becomes somewhat duplicative of a restitution

6    order, and just another means of collecting the same amount --

7                    MR. CASAS:  Yes, sir.

8                    THE COURT:  -- I don't have any problem with that.

9    If it turns out the government is seeking double the amount, I

10   want to think about it more.

11                   MR. CASAS:  Yes, sir.  We'll follow up with that,

12   Your Honor.  Thank you.

13                   THE COURT:  Okay.

14                   All right.  That brings us, Mr. Joffe, to both your

15   motion for a variance and your opportunity to say whatever it

16   is you want, essentially, with regard to sentencing also.

17   Obviously, I'll be happy to hear, after that, from Mr. Perez,

18   and anyone you wish to further testify.

19                   MR. JOFFE:  Very good, Your Honor.

20                   I'm seeking a downward variance under

21   Section 3553(a)(1)(A) through (D); and one of the first factors

22   is the nature and circumstances of the offense, and the history

23   and characteristics of the defendant.

24                   The nature and circumstances of the offense are

25   essentially that this was a clinic that was created by my

1   client's uncle.  My client was brought in after the clinic was

2   established.  He worked there as a receptionist.  And obviously

3   he aided and/or abetted the conduct that occurred at the

4   clinic.  I think his conduct is minor when compared to the

5   others in the clinic.

6          I think the government's portrayal that my client may

7   have falsified or helped to falsify the treatment forms was not

8   supported by the facts of the evidence that came out during the

9   course of the trial.  We saw that there were therapists and

10  other folks there that were doing the majority of the conduct.

11         As far as the history and characteristics of my

12  client, he has no prior criminal history whatsoever.  He's

13  young.  He was involved in this case at a very young age, and I

14  don't think we'll ever see him again in the judicial system.

15         Under (a)(2), the need for the sentence imposed to

16  reflect the seriousness of the offense, to promote respect for

17  the law, and to provide just punishment for the offense, I'm

18  asking for either a split sentence of home confinement followed

19  by probation and/or supervised release, or straight probation,

20  based upon the case in general.

21         Subsection B talks about to afford adequate

22  deterrence to criminal conduct.  I think either a split

23  sentence or a sentence that would allow my client to be under

24  home confinement, and continue to support himself and support

25  his wife and his young child, would afford adequate deterrence

1    to criminal conduct.

2              As far as to protect the public from further crimes

3    of the defendant, I don't believe he's a recidivist.  I

4    honestly believe we will never see him again.  There is nothing

5    to support that.

6              To provide the defendant with needed educational or

7    vocational training, medical care, or other correctional

8    treatment in the most effective manner, I don't know that

9    that's really relevant to Mr. Perez's situation at this point.

10             And I'll rely upon what I filed, as well.

11             THE COURT:  All right.

12             Mr. Perez, is there anything you'd care to say with

13   regard to the sentence the Court should impose?

14             THE DEFENDANT (Via Interpreter):  No.

15             THE COURT:  All right.

16             Mr. Casas?

17             MR. JOFFE:  And I may have an argument for some

18   sentencing disparity, but I don't need to do that at this

19   point.

20             THE COURT:  I'm sorry.  I missed the last part?

21             MR. JOFFE:  I mean as far as the sentences that were

22   meted out so far in the case, I would just ask that the

23   sentences be consistent.

24             THE COURT:  Okay.

25             MR. JOFFE:  Thank you.

1          MR. CASAS:  Your Honor, in this particular case, the

2     Court has sentenced two individuals that were associated with

3     the criminal activity at CNA Family Rehab Center.  Both of

4     those individuals were the massage therapists.  Both of those

5     individuals did provide substantial assistance in relation to

6     the defendant and another co-defendant.  The Court sentenced

7     both of those individuals, for their respective criminal

8     conduct, to terms of probation.

9          In this particular case, I don't think, necessarily,

10    that Mr. Perez is in the same circumstance.  He certainly did

11    not provide cooperation, and he went to trial.  Under the

12    circumstances, he was found guilty of the conspiracy as well as

13    other substantive offenses associated with the conspiracy.

14         Under the circumstances, given the seriousness of the

15    offense, the need to punish the defendant, and to deter any

16    future criminal conduct, we do believe that a sentence within

17    the guideline range of imprisonment of 8 months to 14 months is

18    appropriate, followed by a term of supervised release to

19    follow.

20         We are asking the Court to impose that restitution,

21    and I certainly understand the Court's ruling with regard to

22    taking the money judgment under advisement.  If the Court does

23    grant that, we would ask that that be made part of the judgment

24    at the appropriate time.

25         We do believe that a sentence within the guideline

1    range of imprisonment of 8 months to 14 months is not disparate

2    in any sense.  Certainly, there is one additional defendant,

3    that has yet to be brought before the Court, that will

4    eventually be brought before the Court; and that is Dr. William

5    Hall.  Again, Dr. William Hall, along the Abel Perez, who

6    remains a fugitive, were the organizer/leaders, and certainly

7    they're going to be subject to . . . what the guideline would

8    likely be is a lengthier prison sentence than 8 to 14 months.

9          So, under the totality of the circumstances, 8 to 14

10    months is in line with the defendant's conduct in this case and

11    the overall conduct in relation to his activity at CNA.

12          THE COURT:  And how does his role -- and I don't mean

13    literally role within the meaning of the guidelines, but how

14    does his participation in the case relate, or compare, to

15    Mr. Fernandez, who I think I'm sentencing this afternoon?

16          MR. CASAS:  Mr. Fernandez, in this case, Your Honor,

17    as it relates to CNA, would, in my opinion, be a minor

18    participant.  His role was basically to refer the patients that

19    he could not take at his own clinic to another clinic that was

20    compatible, and therefore he's not similarly situated as

21    Mr. Perez.

22          Mr. Fernandez, again, having his own clinic, in the

23    form of Extreme, to be associated with, was not involved in the

24    day-to-day activity of CNA.  He basically had a relationship

25    with CNA and other clinics where people were referred as

1    necessary.

2            THE COURT:  So Mr. Fernandez's criminal liability

3    arises more from the other case than this case.

4            MR. CASAS:  Absolutely.  Absolutely.  This was a

5    circumstance where, because of the investigation, how it

6    unfolded, Mr. Fernandez winds up getting involved with CNA, but

7    his involvement as it relates to this is limited.

8            THE COURT:  The two persons I've sentenced already,

9    then, Miss Santana and Mr. Duarté, other than the fact that

10   they cooperated --

11           MR. CASAS:  Yes, sir.

12           THE COURT:  -- but just the terms of their

13   participation in the offense, how are they in comparison to

14   Mr. Perez?

15           MR. CASAS:  Mr. Duarté and Miss Santana were

16   part-time employees of CNA.  They basically facilitated the

17   fraud by way of completing the false treatment forms.  Those

18   treatment forms were then turned over to the defendant.

19           The defendant began his employment in approximately

20   May or June of 2011.  He was a full-time employee from that

21   point until the closure of the clinic, in March of 2012, by law

22   enforcement.  Basically, they each had their own respective

23   responsibilities within the clinic.  But that's how you would

24   distinguish them.

25           THE COURT:  I heard Dr. Hall testify in the case, and

1    I think you just said that he eventually will be in front of

2    the Court on a guilty plea.

3             MR. CASAS:  That is correct, Your Honor.

4             THE COURT:  I know that's what he testified was going

5    to happen.

6             MR. CASAS:  Yes, sir.

7             THE COURT:  Is it your view that Dr. Hall and the

8    fugitive Mr. Perez are essentially the ringleaders?  I mean, so

9    far --

10            MR. CASAS:  Yes.  There's no doubt about that.  I can

11   say that unequivocally.  They are the reason that the clinic is

12   in existence.  The other individuals are parts of the clinic,

13   but the overall clinic is created by them.

14            THE COURT:  And Mr. Joffe gave me his sense as to his

15   client, in terms of whether I'm going to see him again.  What's

16   your sense?

17            MR. CASAS:  Well, Mr. Perez, to his credit, has been

18   lawfully employed, to my knowledge, during the pendency of this

19   case.  He has a bleak future, Your Honor, and that's --

20            THE COURT:  He has a what future?

21            MR. CASAS:  Bleak.

22            THE COURT:  A bleak future?

23            MR. CASAS:  Yes.

24            THE COURT:  Okay.

25            MR. CASAS:  He does have some education.  He did try

1    to obtain a certification and training, and that may still

2    possibly be available to him.  I don't know if it's going to

3    be -- in light of the felony convictions, if you have to be

4    licensed for that, it may be that that may not be possible.

5         The hope is that he won't return to crime.  He's

6    going to have a difficult life regardless of that.  There are

7    only so many people that are going to be willing to employ

8    Mr. Perez in positions of trust where you might get higher

9    compensation.  At this point, I think he has eight felony

10   convictions?

11        THE COURT:  A number.  One is all it takes, I guess,

12   to cause problems, but . . . .

13        MR. CASAS:  Yes.  Ballpark.  He doesn't strike me

14   necessarily as a guy who is randomly committing crimes.  This

15   is his first criminal activity that's been detected by law

16   enforcement.  But it's difficult to say that someone who puts

17   themself that corner like this, what the future will hold for

18   them.  I really don't know.

19        THE COURT:  Apart from the felony convictions, which

20   is problematic at this point, do you have a sense for him?  In

21   terms of -- I guess the word would be character?

22        MR. CASAS:  I don't have any direct contact with the

23   defendant, and the only true exposure I had with him is in the

24   post-arrest statement.  This was a family enterprise, Your

25   Honor.  That's obvious.  I mean, this was something that was

1    started by a family member.  He was brought in, most likely,

2    because he was a family member, and he could be trusted.  The

3    hope is that he won't do this again.

4           I'm not trying to denigrate Mr. Perez.  He's not,

5    certainly, the most educated individual; and, perhaps, if he

6    were to ever commit crime, it would not be on this type of

7    level of sophistication.  And there's no reason to believe that

8    he's going to go out and commit violent crimes, or anything of

9    that sort.  He just seems to be a young man who got into crime

10   because his family was involved in crime.

11          THE COURT:  Thank you.

12          Mr. Joffe?  Anything further?

13          MR. JOFFE:  I don't know how bleak my client's future

14   is.  I think his future is what he makes of his future.  He may

15   start his own business and be very successful.  We may someday

16   be buying his product.  I don't know.  I can't say.  I think

17   that the future is what he makes of it.  I think we have to

18   look to his prior history and his prior conduct to say okay,

19   how do we determine what his future conduct is going to be?

20          There's no prior criminal history whatsoever.  What I

21   said earlier was, but for his own uncle, who was his father's

22   brother -- and they were all very close, you know -- telling my

23   client hey, come work in this clinic, I don't think my client

24   ever would have been involved in a clinic involving insurance

25   fraud, or Medicare fraud, automobile fraud, whatever.  I think

1    he was asked to come in by his uncle.  He was under a lot of

2    pressure not only by the uncle, but the father.

3           What was brought out during the course of the trial

4    was that his father and his uncle had had a trucking business

5    together, as well.  I brought that out in cross.  I think I

6    argued that to the jury, as well.  I pointed to the father, as

7    well, who was present in court.

8           As I said earlier to the Court, each and every time I

9    met with my client, the father had to be present, had to play

10   an active role.  I think, at one point, I had to tell him go

11   sit over there and let me talk to your son.

12          So I think this has been a learning experience for my

13   client.  It scared the daylights out of him.  He's terrified of

14   what may happen to him.  I think we've got his attention.  I

15   don't think we'll ever see him here ever again.

16          I would just ask for him to have the opportunity to

17   be able to continue to work and support himself, and support

18   his wife, and obviously start making restitution payments in

19   this case.

20          And I think there is a bit of youthful indiscretion

21   involved in this, as well.

22          THE COURT:  Are you suggesting . . . and I guess I

23   want to get the same from Mr. Casas, that his father was

24   involved -- I know the government says he was involved as a

25   patient, but involved criminally in the activity, or . . . it

1   just hasn't been charged, or --

2              MR. JOFFE:  I don't think there's any evidence of

3   that.  I think there was a lot of family pressure on my client,

4   you know, not only to work there, but also to go to trial.

5              And obviously, when I -- you know, I look at the case

6   a little differently than Mr. Casas would, because my

7   perspective is trying to defend my client.  I'm not looking to

8   see who I can indict, who is criminally culpable.  I'm trying,

9   essentially, to disassemble the government's case, for lack of

10  a better word.

11             So I don't know if the government could present

12  enough evidence to indict the father; but I think, clearly, the

13  father may have been present, had knowledge, and knew what was

14  going on.  And clearly, you know, a father's role is to say to

15  his son, look, this is not a good idea for you.  This is what

16  my brother's involved in.  Maybe I'm involved in it.  Stay out

17  of it.  This is not good for you and your future.  Especially

18  based upon the fact that you've emigrated from Cuba, and you

19  need to have a positive future here in the United States, and

20  it theoretically could impact your immigration status at some

21  point.

22             So I think there was also some misdirection that was

23  given to my client by his father.

24             THE COURT:  All right.

25             Mr. Perez, anything further you'd like to say at this

1    point?

2            THE DEFENDANT (Via Interpreter):  No.

3            MR. JOFFE:  No, Your Honor.

4            THE COURT:  All right.  Anything else, from the

5    government or defense?

6            MR. CASAS:  No, Your Honor.

7            THE COURT:  All right.

8            Well, as the lawyers know, the Court is required to

9    impose a sentence that is sufficient, but not greater than

10   necessary, after considering all the factors in Title 18,

11   United States Code, Section 3553.  I've considered all those

12   factors, whether we talk about them individually or not.  There

13   are some of the factors that I do wish to discuss.

14           I have read Mr. Joffe's motion for the downward

15   departure and request for variance prior to coming on the

16   bench.  The defendant has, I think, literally no criminal

17   history.  He has strong family ties to the area, but at least

18   some of those family ties are not positive, in terms of his

19   involvement in criminal activity.  Meaning in this particular

20   case.  He's a young man.

21           In looking at his role, while I still don't see it as

22   minor, it is not significantly different than the others who

23   I've sentenced.  It is significantly different than those I

24   haven't sentenced yet in this case.

25           I guess I come down to if the defendant had done

1   what, perhaps, he was advised to do, and enter a plea of

2   guilty, I'd be looking at him as a pretty easy probation

3   candidate.  He didn't do that.

4           I am not going to punish him for going to trial.

5   That's his constitutional right.  Whatever it means that he

6   decided not to do that in terms of his relatives, it is what it

7   is, I guess, in terms of the evaluation.

8           But in terms of what he did in the case, and his

9   personal situation, and his admissions prior to trial, like I

10  said, if it hadn't been a jury trial, and if it had been the

11  defendant accepting a plea of guilty, it would have been a

12  fairly . . . easy decision, I think.

13          In the end, the Court is going to impose the

14  following sentence:

15          It's the judgment of the Court that the defendant be

16  placed on a term of probation for five years.  As a special

17  condition of that probation will be 180 days of home

18  confinement under the home confinement program of the Middle

19  District of Florida.  The Court is going to impose all the

20  standard conditions adopted in the Middle District of Florida.

21  The special conditions will include that home detention

22  program.

23          The defendant will be required, pursuant to Title 18,

24  United States Code, Section 3583(d), to report to a duly

25  authorized immigration official to determine if removal is

1     appropriate.  If the defendant is ordered removed from the

2     United States, he will be required to remain outside the United

3     States unless authorized by the Secretary for the Department of

4     Homeland Security, or other appropriate immigration official.

5                  The defendant will be required to cooperate with the

6     probation office in the collection of DNA.

7                  The mandatory drug testing requirements of the

8     Violent Crime Control Act are waived.  However, the defendant

9     will be required to submit to random drug testing, not to

10    exceed 104 tests per year.

11                 The defendant will be required to make restitution

12    payments in the amount of -- I said that wrong.  Will be

13    required to make restitution, in the total amount of

14    $14,866.37, to State Farm Insurance.  Restitution will be paid

15    jointly and severally with his other co-conspirators in this

16    case.

17                 The defendant will be required to make restitution

18    payments at a rate of ten percent of his monthly earnings, and

19    to continue to make those payments.

20                 If the defendant's financial situation changes, any

21    party may come to court and request a change of that schedule.

22                 Based upon the defendant's requirement to make

23    restitution payments and his financial status, the Court would

24    waive the imposition of any fine.

25                 Did I indicate special assessments yet?

```
 1              MR. JOFFE:  No, Your Honor.

 2              THE COURT:  Okay.  The defendant will be required to

 3    pay the special assessments.  Those are mandatory, and those

 4    total . . . .

 5              MR. JOFFE:  I think it's 800, Your Honor.

 6              THE COURT:  I was going to say, I thought I saw 800

 7    here, but I don't see it here now.  But I believe you are

 8    correct, those total $800.

 9              MR. JOFFE:  And if it's different, then we don't

10    object to . . . .

11              THE COURT:  It's the number of counts of conviction

12    times a hundred dollars, so . . . .

13              The defendant will be required to provide the

14    probation officer with access to any requested financial

15    information.

16              All right.  Counsel, any additional condition or

17    recommendation anyone wants me to consider?

18              MR. CASAS:  No, Your Honor.

19              MR. JOFFE:  No, Your Honor.

20              THE COURT:  Counsel, having heard the sentence the

21    Court has imposed, and the manner in which it has been imposed,

22    are there any objections?  First, from government?

23              MR. CASAS:  No, Your Honor.

24              THE COURT:  From the defendant?

25              MR. JOFFE:  No, Your Honor.
```

1        THE COURT:  Mr. Perez, I do need to advise you that

2   you do have the right to appeal both your convictions and the

3   sentence I've imposed.  To do that, you have to take -- you

4   have to file what's called a notice of appeal within 14 days of

5   the entry of the judgment.  If you fail to file the notice of

6   appeal within that time period, you'll waive, or give up, your

7   right to take an appeal.

8        If you wish to appeal, you have the right to be

9   represented by an attorney, and if you cannot afford an

10  attorney, the Court will have your court-appointed counsel

11  continue to represent you at no cost or obligation to yourself.

12       Do you understand what I've said about your right to

13  appeal?

14       THE DEFENDANT (In English):  Yes.

15       MS. PEDROZA-HARDING:  Yes.

16       THE COURT:  Do you have any questions about that?

17       THE DEFENDANT (In English):  No.

18       MS. PEDROZA-HARDING:  No.

19       THE COURT:  All right.

20       And just so the record is clear, the sentence I've

21  imposed will be imposed on each count, and will be served

22  concurrently with one another.

23       Mr. Casas, how much time will you need to get back

24  with the Court as to the money judgment issue?

25       MR. CASAS:  I was going to ask the Court how you

```
 1    wanted me to communicate that with the Court.

 2              THE COURT:  I'd prefer just a notice, a written

 3    notice from the government saying this is our position, and

 4    I'll take it from there.

 5              MR. CASAS:  Yes, sir.  I would think by the end of

 6    this week.

 7              THE COURT:  That's fine.

 8              All right.  Counsel, anything further, from either

 9    side?

10              MR. JOFFE:  No, Your Honor.

11              MR. CASAS:  No, Your Honor.

12              THE COURT:  All right.

13              Mr. Perez, I usually don't give speeches to people,

14    particularly after I sentence them; but in my view, I'm giving

15    you the opportunity to have this case not get in your way of

16    your future.  I don't know if you have a bleak future or not;

17    but, for the next five years, if you mess up, you're going to

18    be brought back in front of me, and the next sentence you won't

19    like if you mess up.  Do you understand that?

20              THE DEFENDANT (Via Interpreter):  Yes.

21              THE COURT:  All right.  Nothing personal, but I hope

22    not to see you again.  Good luck.

23              THE DEFENDANT (In English):  You won't.

24              MS. PEDROZA-HARDING:  You won't.

25              THE COURT:  All right.  We'll be in recess until this
```

1    afternoon.

2             MR. JOFFE:  Thank you, Judge.

3                   -- -- -- -- -- -- -- --

4        (Thereupon, at 10:31 o'clock a.m., the above-entitled

5        matter was concluded.)

6                   -- -- -- -- -- -- -- --

7                       CERTIFICATE

8        I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

9    ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN

10   THE ABOVE-ENTITLED MATTER.

11

12       Dated this 29th day of July, 2013.

13

14                        /s/ Jeffrey G. Thomas
                          JEFFREY G. THOMAS, RPR
15

16

17

18

19

20

21

22

23

24

25